424 So.2d 214 (1982)
STATE of Louisiana
v.
Juan SERRATO.
No. 81-KA-2610.
Supreme Court of Louisiana.
November 29, 1982.
Rehearing Denied January 7, 1983.
*215 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. Nathan Stansbury, Dist. Atty., Charles M. Brandt, Asst. Dist. Atty., for plaintiff-appellee.
*216 Arthur A. Lemann, III, James J. Adams, Fournet & Adams, for defendant-appellant.
DIXON, Chief Justice.
Defendant Juan Serrato was convicted of second degree murder in violation of R.S. 14:30.1 on April 3, 1981 and was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. Defendant's motion for a new trial was denied. He now appeals his conviction and sentence arguing two assignments of error and one error patent.
On the morning of October 10, 1980, shortly after 11:00 a.m., Serrato, a helicopter pilot, decided to drive to New Iberia from his home in Lafayette to pick up his paycheck. His wife asked him to take their three year old daughter with him so she could get some sewing done. As Serrato was leaving, his wife hollered at him not to "stay down there all damn day long." After putting his daughter into the car, Serrato returned to the house to get a snack for her. Resolving to persuade his wife to accompany them, he found her seated at her sewing machine in their bedroom. Serrato playfully hugged her and asked her to join them. She angrily replied, "why don't you just get the hell out of here. Those people down there mean more to you than I do."
The next thing Serrato remembered was sitting on his bed trembling with his wife's body sprawled next to him. He left the house without checking on his wife's condition and drove to New Iberia. A neighbor later discovered Kathy Serrato lying on her bed strangled with a piece of cloth.

Assignment of Error No. 1
By this assignment defendant contends that the trial court erred in denying his motion to suppress his confession based on three grounds: (1) illegal detention; (2) right to counsel; and (3) free and voluntary standard.
In his pretrial motion, defendant recited, as his only ground to suppress, that the confession and other inculpatory statements were inadmissible since they were not made freely and voluntarily, but were made under the influence of fear, duress, intimidation and improper psychological coercion. The trial judge denied the motion to suppress on this ground without assigning any reasons.
Defendant now asserts as additional grounds to suppress that the confession was the product of an illegal arrest and was procured in violation of his right to counsel. These grounds were first raised by defendant on motion for a new trial. Defendant's failure to address these two grounds in his pretrial motion does not preclude him from raising them now. In State v. Roach, 322 So.2d 222, 226 (La.1975), this court stated that, based on the former language of C.Cr.P. 703(C),[1] "our scope of review should be limited to those grounds on which the motion to suppress was based." However, since that decision, C.Cr.P. 703 has been rewritten to shift the burden of proof on a motion to suppress an oral confession or other inculpatory statement. Prior to the 1978 and 1980 amendments to C.Cr.P. 703, the burden of proof rested with the defendant on a motion to suppress oral confessions or other statements and with the state to prove the admissibility of written inculpatory statements. Now the state has the burden of proving the admissibility of both written and oral inculpatory statements by the defendant. C.Cr.P. 703(D).[2]
*217 This court in State v. Roach, supra, concluded that new grounds could not be raised after the hearing on the pretrial motion since the burden of proof to suppress an oral confession rested with the defendant. However, since C.Cr.P. 703(D) has placed the burden of admitting both oral and written confessions on the state, this court can now properly review additional grounds to suppress fully argued later at trial on the merits or at a hearing on a motion for a new trial. In view of the fact that defendant in the instant case submitted two additional grounds to suppress in his motion for a new trial, they are properly before this court.

Illegal Detention
Defendant first came in contact with police officers when he returned from New Iberia by helicopter at approximately 1:30 p.m. He had rushed home to Lafayette after an investigating officer at the scene had answered his phone call, informing him that his wife was ill and that he should return home as soon as possible.[3] Upon arrival he was met by several police officers, who refused to let him enter his house and who escorted him to his neighbor's house.
At 3:30 p.m. Serrato voluntarily accompanied Detectives Broussard and Rickard to the police station where he was advised of his Miranda rights. After waiving his rights at 4:10 p.m., Serrato was interrogated by Broussard, Rickard and two officers, Sergeant Cormier and Lieutenant Boutte, until 8:30 that night.[4] After the questioning, at approximately 9:00 p.m., he was formally arrested without a warrant and placed in a holding cell. The incriminating statements were obtained from the defendant almost twenty-four hours later.
A lawful arrest, whether warrantless or pursuant to an arrest warrant, must be based upon probable cause. State v. Leatherwood, 411 So.2d 29 (La.1982); State v. Herbert, 351 So.2d 434 (La.1977); State v. Ranker, 343 So.2d 189 (La.1977). While the state's burden of proving the lawfulness of an arrest is far less than its burden of proving a defendant's guilt at trial, mere suspicion on the part of the arresting officer is not enough. State v. Haynie, 395 So.2d 669 (La.1981); State v. Thomas, 349 So.2d 270 (La.1977); State v. Randolph, 337 So.2d 498 (La.1976). The officer must have probable cause to arrest.
In State v. Leatherwood, supra at 32, this court defined probable cause as existing "when the facts and circumstances within the arresting officer's knowledge and of which he has reasonable and trustworthy information are sufficient to justify a man of average caution in the belief that the person to be arrested has committed or is committing an offense." If probable cause for defendant's arrest existed, the confession would be admissible if it was otherwise voluntary and was made after appropriate Miranda warnings. If no probable cause existed, the confession would be admissible only if the state could show that the connection between the arrest and the subsequent confession was so attenuated that the confession could not logically be considered as a fruit of the illegal arrest. State v. Leatherwood, supra; Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Factors to be considered in making this determination are whether the defendant was advised of his Miranda rights prior to the confession, the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and the purpose and flagrancy of any official misconduct. State v. Giovanni, 375 So.2d 1360 (La.1979).
*218 In the instant case, the record is not conclusive as to whether probable cause existed to arrest Serrato. Sergeant Cormier, the assigned supervisor of the homicide scene, testified that at least until 6:00 p.m. on October 10, the time all of the evidence had been seized from the scene of the crime, he had not determined that Serrato had killed his wife. What, if anything, occurred between 6:00 p.m. and 9:00 p.m. must be left to speculation.[5]
Since the prosecution bears the affirmative burden of proving that probable cause to arrest existed, any doubts as to the sufficiency of proof must be resolved in favor of the defendant. In this case we are unable to ascertain from the record whether the state carried its burden of proving that probable cause existed at the time of the formal arrest. Accordingly, we must conclude that the arrest was illegal and determine whether the confession was sufficiently attenuated from the arrest in order to be admissible.
At the hearing on the motion for a new trial, the trial court stated that it did not feel as though the issue of illegal detention was properly before it. Nevertheless, in passing, the trial judge noted that "a sufficient time and a sufficient occurring of events between the detention period and the statement [had elapsed] so as to sufficiently attenuate any illegality of detention, and, thereby, any statement would not have been tainted." We agree with this finding.
Whether the confession is sufficiently attenuated from the arrest is a question to be resolved in light of the facts of the particular case. In the instant case, Miranda warnings were administered a second time to defendant on October 11 between 4:30 and 5:00 p.m. Even though not decisive, the giving of this warning and a waiver of these rights are important factors to be considered in determining whether the illegal arrest tainted any subsequent confession. Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).
Further, the "temporal proximity of the arrest and the confession" was fairly distant. Serrato began confessing to Sergeant Cormier at approximately 6:30 p.m. on October 11. Serrato had been formally arrested the previous day, October 10, at 9:00 p.m. Thus, over twenty-one hours had elapsed between the time of the formal arrest and the confession.
Serrato was transferred from the Lafayette City Police Department to the Office of the State Police on October 11. At 2:08 p.m. Serrato signed an interrogation agreement authorizing the Louisiana State Police to either interview him or to take his polygraph examination. He again signed his name to the agreement at 4:53 p.m. at the conclusion of the interrogation, certifying that he was well treated, submitted freely to the examination, and knowingly and intelligently waived his rights. This episode at the Office of the State Police was a sufficient intervening circumstance, considering the lack of any flagrant official misconduct, the time interval, and the giving of the Miranda warnings, to validate the subsequent confession obtained later at the detectives' annex of the city police department. State v. Leatherwood, supra. Viewing all of the facts and circumstances of this case, it does not appear that the trial judge abused his discretion in concluding that the confession was sufficiently attenuated from any illegality of the detention. This allegation lacks merit.

Right to Counsel
Defendant next alleges that he was denied his right to counsel at the time he confessed to the crime. This ground, like that of illegal arrest, was introduced at the motion for a new trial. For the reasons *219 already expressed in our analysis of the issue of illegal arrest, this additional ground to suppress will be considered.
On October 11 Serrato was questioned by both the State Police at their headquarters and by Detectives Broussard and Rickard back at the detectives' annex, before Sergeant Cormier commenced interrogation of Serrato at 6:00 p.m. According to the prosecution, the questioning by Cormier ceased at 6:30 p.m. when Serrato began to implicate himself. At this point Cormier told Serrato that he would contact an attorney for him.[6]
Serrato related a somewhat different version of the facts. He testified that he fainted at some point during the examination on the evening of October 11. After recovering from his fainting spell, Serrato asked Cormier either to provide him with an attorney or to recommend an attorney. Cormier responded that he was unable to comply and instead handed a telephone book to the defendant for the apparent purpose of finding an attorney. Because his vision was blurred due to his fainting spell, Serrato was unable to read the telephone directory. He was also unsuccessful at deciphering the attorney's name on both his and his wife's wills. He requested Cormier's assistance, but Cormier replied that he didn't know the names or anything on the wills.
Both Cormier and Serrato agreed that some effort was made to select an attorney from the telephone directory and to ascertain the name of the lawyer who had drafted the wills for the Serratos. When this effort proved to be fruitless, Cormier instructed Detective Broussard to contact the Indigent Defender Board.
After this episode, according to Serrato, several of the officers continued to question him on a rotating basis. Serrato was not informed that an attorney had been contacted. Rather, he was promised that it would be easier for him if he confessed.
Cormier, on the other hand, denied making any promises to Serrato or questioning him once an attorney had been summoned. He further maintained that he told Serrato "that there would be [a lawyer] on the way."
Meanwhile, the director of the Indigent Defender Board, Michael J. Barry, received a call from the city police informing him that Serrato requested counsel "prior" to making any statements to the police. Barry called the residence of an attorney, John Smith (fictitious name), who was not home at the time. Shortly thereafter, when Smith returned home from a day of fishing, his wife, Mary (fictitious name), notified him that he was to represent Serrato. Smith stipulated that he left for the police station at approximately 7:15 p.m. after changing his shirt and consuming one highball.
Smith was delayed at the station for over one-half hour before being directed to the detectives' annex across the street. At the annex he was detained by Detective Broussard, Lieutenant Boutte and Sergeant Cormier who inquired if he had been drinking. One of the officers sniffed his breath, exclaiming, "Ooh, smell him!" and then all of the officers began to laugh. The officers refused to allow Smith to confer with his client declaring that he was too intoxicated. Smith then called his wife, Mary, also an attorney, and asked her to come down to the station. Mary Smith arrived at the station "sometime after seven." Two detectives escorted her to the cubicle where Serrato was waiting, suggesting that they "all sit down and have a friendly little conversation." Instead, Mrs. Smith demanded a private conference with her client. Mrs. Smith spoke with a "quite emotionally overwrought" Serrato for thirty to forty minutes in a partially enclosed cubicle. She could hear voices in the adjoining room and assumed that they could overhear her conversation with her client. After their meeting, Mrs. Smith insisted on *220 accompanying Serrato back to his cell since the officers refused to disclose their plans for him.
Later, at about 9:15 p.m., Michael Barry telephoned the Smith residence to check on the status of the case and then learned what had transpired at the police station. Barry, a former state trooper who had frequently arrested persons for driving while intoxicated, drove to the Smith home to verify personally Mr. Smith's physical condition. He testified that Smith appeared to be tired and his eyes were bloodshot, but he was not intoxicated.
Article 1, § 13 of the 1974 Louisiana Constitution guarantees the right to the assistance of counsel. This guarantee includes the right of defendant to have counsel present during any post arrest interrogation should defendant express such a desire. State v. Matthews, 408 So.2d 1274 (La.1982). This court has held that when counsel has been retained or appointed to represent a prisoner, governmental authorities cannot deny the lawyer reasonable access to his client, nor can they ignore his request for a conference with his client before the interrogation. Confessions taken in violation of these principles are constitutionally inadmissible, since the interrogation would have been undertaken without an informed waiver of defendant's right to the assistance of counsel and his right to remain silent. State v. Trevathan, 414 So.2d 316 (La.1982); State v. Matthews, supra; State v. Jackson, 303 So.2d 734 (La. 1974), citing Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).
The facts of the instant case indicate that the police officers failed to honor scrupulously defendant's right to the assistance of counsel. Even though defendant had waived his right to counsel the previous day, it appears from the record that he reconsidered his waiver on his second day in custody. Clearly the defendant somehow communicated to the officers on October 11 that he desired an attorney. Cormier's actions in contacting the Indigent Defender Board on behalf of defendant support this contention. Once counsel was summoned, defendant should have been returned to his cell, and the interrogation should have ceased until the attorney's arrival. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
Once counsel has been obtained for the defendant, he has the right to be informed that an attorney is available and willing to assist him. Statutorily, a defendant has the right to consult with counsel from the moment of his arrest. C.Cr.P. 230.[7] Counsel is entitled to have free access to his client, in private, at reasonable hours. C.Cr.P. 511.[8] Based on these statutes and La. Const. Art. 1, § 13, "it is the policy of this state to welcome and encourage an attorney to confer with his client in order that he may intelligently exercise his rights during custodial interrogation." State v. Matthews, supra at 1278.
In the instant case, John Smith arrived at the police station prepared to render assistance to his client. The police refused to grant him access to his client, alleging that he was intoxicated. Smith, Mrs. Smith and Michael Barry sharply disputed this finding of intoxication. Regardless of whether Smith was intoxicated, the police officers exceeded the scope of their authority in preventing this privileged meeting between the attorney and his client.
Article 1, § 13 assures the defendant of the right to the assistance of counsel of his choice. Once an attorney has been selected to represent a defendant, the police are not empowered to pass judgment on his *221 abilities as a legal adviser. There is no provision in the statutes nor in the Constitution of Louisiana that would permit the police to arbitrarily prevent or impede communication between a prisoner and an attorney who has been requested to represent the accused. Only the defendant has the right to reject or waive the assistance of counsel. The police must allow counsel a private consultation with the accused, provided that the time is reasonable. C.Cr.P. 511. When a person in custody is interrogated by police officers, the time is always reasonable for counsel to have free access to meet in private with his client.
If an identified attorney is actually available and seeking an opportunity to render assistance to defendant, and the police neglect to convey that fact to defendant, any statement obtained after the police themselves know of the attorney's efforts to assist the arrested person cannot be rendered admissible on the theory that the person knowingly and intelligently waived counsel. State v. Matthews, supra at 1278.
However, Serrato first implicated himself prior to the invocation of the right to counsel. The record suggests that Cormier interrupted the confession after Serrato admitted to the strangulation. At trial Cormier testified that Serrato revealed what happened up until his actions in New Iberia before Cormier interrupted the confession. Cormier testified at trial only as to the inculpatory statements made by Serrato prior to the invocation of the right to counsel. He did not relate any incriminating statements made by Serrato after the Indigent Defender Board had been contacted. Cormier's testimony at trial must be found to be accurate since Serrato, on direct questioning, agreed with Cormier's recital of the facts. Because the jury did not have before it any tainted statements and relied on only the inculpatory statements made prior to the invocation of counsel, there was no error in the use of these statements at trial.
Free and Voluntary Standard
At the motion to suppress defendant asserted as his original ground that the inculpatory statements were not made freely and voluntarily. The trial judge denied the motion without assigning reasons.
The prosecution has the burden of proving that the confession was freely and voluntarily made before it can be admitted into evidence. R.S. 15:451 provides:
"Before what purposes [purports] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises."
The question of voluntariness of a confession, including a determination of the defendant's state of mind, must be resolved from the facts and circumstances of the particular case. State v. Williams, 383 So.2d 369 (La.1980) cert. denied, Williams v. Louisiana, 450 U.S. 971, 101 S.Ct. 1493, 67 L.Ed.2d 622 (1981). The trial judge must consider the "totality of the circumstances" in arriving at his finding that the confession is admissible. See State v. Volk, 369 So.2d 128 (La.1979); State v. Glover, 343 So.2d 118 (La.1977).
The defendant alleged that he was questioned continuously on October 10 from the time he arrived at the station until his formal arrest at 9:00 p.m. After his arrest he was stripped of his shoes and socks and placed in a holding cell. Late the next morning, after being fed for the first time since his detention, Serrato was transferred, handcuffed and without shoes or socks, to the highway patrol office for further questioning. He was then returned to the detectives' annex for the last phase of his interrogation. Serrato lost consciousness briefly during this examination, which was attributed to his being without his ulcer medicine since the previous day. Sometime after his "weak spell," counsel was sent for.
The trial judge apparently concluded that the facts and circumstances presented at the hearing confirmed that the confession was given freely and voluntarily. The officers involved repeatedly testified as to their treatment of the defendant, their *222 lack of coercion, their reading of the Miranda warnings, and their voluntary action in obtaining counsel for the defendant. They denied that defendant was physically or mentally abused in any manner whatsoever. The judge accorded greater weight to the credibility of the police officers than the defendant in arriving at his finding. We find no error in the trial judge's determination that the totality of the circumstances established that the confession was made freely and voluntarily.
In addition to the "totality of the circumstances" argument, defendant suggests that the confession was procured by promises or inducements. If a confession is obtained as the result of promises or inducements, it is not admissible. State v. Petterway, 403 So.2d 1157 (La.1981); State v. Dison, 396 So.2d 1254 (La.1981). Once a defendant asserts that his confession was obtained in such a manner, the state must rebut the defendant's allegations to carry its burden of proving the voluntariness of the confession. The state cannot rely merely on general disclaimers of inducements or promises; rather, it must rebut specifically each of defendant's allegations. State v. Petterway, supra; State v. Dison, supra.
During the period prior to the appearance of Mrs. Smith, Serrato claimed that the police informed him that it would be easier for him if he confessed. Defendant's version of the substance of the conversation is as follows:
"Q. Were you ever given any promises or were any promises ever implied to you that you can remember?
A. Yes, Sergeant Cormier told me that if things worked out for me the worse that could happen to me would be I would be sent to Pineville, Pineville, yeah, or that I would, if I cooperated I would have a shorter sentence and maybe end up as a trustee.
Q. Did you know what a trustee was?
A. No, sir.
Q. Were you ever threatened with ultimate conviction?
A. Yes. Sergeant Cormier, noLieutenant Boutte was the one who said that he knew absolutely, there was no doubt in his mind.
Q. He knew absolutely, there was no doubt in his mind?
A. Right."
In addition, defendant declared that Detective Rickard reeled off questions to him very rapidly and when not satisfied with the response, the detective "would take a pack of cigarettes and throw it against the wall or slap his pen down on the table, `Aw, come on,' ..." However, defendant testified that he was never physically threatened during his interrogation.
The state specifically rebutted Serrato's allegations of threats, inducements and promises. Therefore, the trial court's finding that defendant was not coerced into confessing by any actions of the police, is not unsupported by the evidence. Our review of the entire record supports the finding of the trial judge that the confession was made freely, voluntarily and without coercion.
Defendant's first assignment of error lacks merit.

Assignment of Error No. 2
By this assignment defendant contends that the trial court erred in denying his motion for a new trial. Defendant moved for a new trial on the basis of newly discovered evidence that showed that he was suffering from posttraumatic stress disorder resulting from his service as a helicopter pilot in Vietnam. The trial court denied defendant's motion for three reasons: (1) defendant failed to exercise due diligence in obtaining evidence of the defense; (2) in assessing the medical testimony, it did not appear that it would have changed the verdict rendered below; and (3) since defendant had not asserted a plea of not guilty by reason of insanity the medical testimony could not have been admitted into evidence.
Two psychiatrists, Drs. Hayes and Ritter, testified at the hearing that Serrato suffered from posttraumatic stress disorder and did not know right from wrong when he killed his wife. The defendant was tried *223 and convicted in late March and early April, 1981. He was examined by Dr. Hayes in November, 1980 and in January, 1981 and by Dr. Ritter in August, 1981 and in December, 1981. Hayes suspected that Serrato was suffering from posttraumatic stress disorder after his examinations, but because Serrato denied any symptoms associated with this disorder, Hayes was unable to make that diagnosis at that time. Instead, he diagnosed him as suffering from a severe depressive neurosis. In October, 1981 Drs. Hayes and Ritter discussed Serrato's condition. New information provided by Ritter confirmed Hayes' earlier suspicions that Serrato was a victim of posttraumatic stress disorder.[9] Ritter testified that Hayes' failure to diagnose the condition was due to Serrato's involuntary and automatic denial of suffering from any mental defect or disease.
Hayes admitted that he became aware of the psychiatric condition known as posttraumatic stress disorder in 1980 after learning of it from the desk manual generally used by the psychiatric profession, The Diagnostic and Statistic Manual III. The manual was first released in unfinished form in early 1980 and was recommended to the American Psychiatric Association for use in diagnosis and treatment in July, 1981. Ritter testified that the Veteran's Administration did not recognize posttraumatic stress disorder as a treatable disease until October, 1980.
Defendant asserts that the testimony of the two doctors was sufficient to warrant a finding that a new trial was required under C.Cr.P. 851(3).[10] As this court recently observed in State v. Fuller, 414 So.2d 306, 308 (La.1982):
"On a motion for a new trial based upon newly discovered evidence, the defendant has the burden to show that the evidence could not have been discovered before or during trial through the exercise of reasonable diligence. La.C.Cr.P. art. 851(3); State v. Simms, 410 So.2d 1040 (La.1982). The ruling on a motion for a new trial is committed to the sound discretion of the trial judge and will be disturbed on appeal only when there is a clear showing of abuse of that discretion. State v. Spell, 399 So.2d 551 (La.1981); State v. Manning, 380 So.2d 54 (La.1980)."
Defendant contends that he failed to discover the defense because his own psychiatric condition automatically and subconsciously led him to deny that the condition existed. This defense mechanism prevented Hayes from properly diagnosing him. However, Hayes admitted that "[o]ne of the classic symptoms of this disorder is the denial of its symptoms ..." He also knew prior to trial that Serrato had served in Vietnam, and he was familiar with posttraumatic stress disorder and its classic symptom.
It would appear that the failure of the defendant to assert this defense at trial was due to both the failure of Hayes to properly diagnose Serrato as suffering from posttraumatic stress disorder and defendant's lack of due diligence in seeking further psychiatric evaluation or follow up.
In addition to the finding of lack of due diligence, the trial judge concluded that it did not appear that the medical testimony would have changed the verdict rendered below. Dr. Hayes testified that the information *224 upon which he relied in diagnosing Serrato's disease as posttraumatic stress disorder was obtained directly from Serrato and from Dr. Ritter. Dr. Hayes never personally verified the fact that Serrato was a veteran of the Vietnam war nor did he examine his combat record.[11] Neither Dr. Hayes nor Dr. Ritter ever spoke with any of Serrato's "companions in arms who were present at the time that he underwent these alleged traumatic experiences in Vietnam." Other than defendant's recollections of his experiences, there was no independent verification that he suffered any trauma in Vietnam.
Dr. Hayes admitted that he had not read the transcript of the trial and so was not aware that defendant had confessed to Cormier that he had strangled his wife. Serrato had informed the doctor that he did not remember strangling his wife.
Further, Dr. Hayes testified that immediately before his wife's death, Serrato was able to understand the difference between right and wrong since "he went into the kitchen and had the forethought to get a cookie that he promised to give his daughter and bring it back to the car to her."
Dr. Ritter stated that Serrato did not possess all of the symptoms associated with posttraumatic stress disorder. There was no indication of any "memory impairment or trouble concentrating, avoidance of activities that allow recollection of the traumatic event, [or] intensification of symptoms by exposures to events that symbolize or resemble the traumatic event."
Examining the inconclusive testimony of these psychiatrists, it is extremely doubtful whether their perceptions would have persuaded the jury to render a verdict of not guilty.
"In considering a motion for new trial based on newly discovered evidence, the test to be used is not simply whether another jury might bring in a different verdict, but whether the new evidence is so material that it ought to produce a different result than the verdict reached...." State v. Motton, 395 So.2d 1337, 1350 (La.1981), cert. denied 454 U.S. 800, 102 S.Ct. 289, 70 L.Ed.2d 139 (1981).
The newly discovered evidence presented by these two psychiatrists does not meet this stringent test. A trial judge may accept or reject an opinion of a medical expert depending on how impressed he is with the qualifications, testimony and credibility of the expert. Where credibility is involved, the trier of fact is best situated to make that determination. In this case the trial judge felt that the testimony of the medical experts was not so material that it ought to produce a different verdict. Since there is no clear showing of abuse of discretion, the ruling of the trial judge will not be disturbed.
In addition to the foregoing reasons, the trial judge pointed out that defendant had never entered a plea of not guilty and not guilty by reason of insanity. However, even if defendant had entered this plea timely, the trial judge concluded "that the evidence would probably not have changed the verdict of guilty." We agree with this finding.
Upon consideration of the facts of this case, we cannot say that the trial judge abused his discretion in concluding that the belated diagnosis of posttraumatic stress disorder did not qualify as newly discovered evidence. This assignment of error lacks merit.

Error Patent
Defendant asserts as error patent that the trial court denied in open court his motion to suppress his confession without the presence of either his attorneys or himself. C.Cr.P. 834 addresses the right of a defendant to be present at the making, hearing and ruling on preliminary motions directed solely to the court. This article provides in part:
"The defendant has a right to be present, but his presence is not essential to the *225 validity of any of the following proceedings in a criminal prosecution:
(1) The making, hearing of, or ruling on a preliminary motion or application addressed to the court."
Thus, even though it is better procedure for the defendant and his counsel to be present at rulings on preliminary motions, C.Cr.P. 834(1) does not require their presence. C.Cr.P. 831 is inapplicable to the present case for it does not pertain to preliminary motions.[12]
Accordingly, we find no error in the trial judge's ruling on the preliminary motion outside of the presence of defendant and his attorneys.
For the reasons assigned, the conviction and sentence are affirmed.
LEMMON, J., concurs in the result, not necessarily agreeing that the defendant can raise, for the first time on appeal, new grounds for the suppression of a confession.
DENNIS, J., concurs in part and dissents in part with reasons.
DENNIS, Justice, concurring in part and dissenting in part.
I respectfully concur in part and dissent in part.
The circumstances of this case do not support the conclusion that Serrato's confession was made without exploitation of the prior illegal arrest and by means distinguishable to be purged of the primary taint. State v. Bennet, 383 So.2d 1236, 1242 (La. 1980) citing Maguire, Evidence of Guilt, 221 (1959) cited in Wong Son v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963).
The majority can only point to two factors which support the conclusion that the confession made by Serrato was not tainted by his prior illegal arrest: (1) the lapse of twenty-one hours between the time of his arrest and the confession, and (2) the administration of Miranda warnings and the execution of an interrogation agreement. The majority hints that the change in scenery from the Lafayette City Police Department to the Office of the State Police, with the defendant's subsequent return to the City Police Department, is such an intervening circumstance that its combination with these other two factors is sufficient to attenuate the taint of the illegal detention.
While temporal proximity is certainly a factor to be considered, the majority places too great a weight upon the passage of twenty-one hours. See State v. Giovanni, 375 So.2d 1360 (La.1979) where we suppressed statements made seven days after an illegal arrest. This is particularly true in light of the fact that no intervening circumstance of significance occurred to interupt the continuous custodial detention. The majority points to a change in locale as an intervening circumstance. But, this is hardly the type of event contemplated by the Supreme Court in Brown v. Illinois when the test for attenuation was first articulated. In Johnson v. Louisiana, 406 U.S. 35, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), cited in Brown as an example of a case without intervening circumstances, the court was concerned with the fact that defendant did not appear before a magistrate until after the confession and booking procedures. 92 S.Ct. 1626, 32 L.Ed.2d at 161. See also Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) where the release on recognizance of defendant and his subsequent voluntary surrender was an intervening event of significance. *226 To compare a change in location to the intervention of an impartial magistrate is to stretch the Brown formulation beyond its limits. The only other factor utilized by the majority is the presence of Miranda warnings and the defendant's signature on an interrogation agreement. These are certainly relevant, but over-reliance on them may betray a lingering confusion between voluntariness for purposes of the Fifth Amendment and the "causal connection" test established in Brown. Dunaway v. New York, 442 U.S. 200, 219, 99 S.Ct. 2248, 2260, 60 L.Ed.2d 824, 840 (1979).
The overriding message of both Brown and Dunaway is a concern for whether the authorities came at the confession by exploitation of the prior illegality such as to create a "causal connection" between the two. This is evidenced by a concern in both cases that the police had engaged in what was termed a "fishing expedition" by the arrest of the defendants, and interrogation with the hopes that some evidence might "turn up." 442 U.S. at 218, 99 S.Ct. at 2259, 60 L.Ed.2d at 840.
The record in the present case is devoid of evidence concerning the reasons for the initial arrest of the defendant. This has led the majority to conclude that the state failed to establish that the arrest was supported by probable cause. Likewise, it leads me to conclude that this record fails to demonstrate that the confession was sufficiently attenuated from the taint of defendant's illegal arrest that its introduction into evidence was in violation of both the Fourth Amendment and Article I § 5 of the Louisiana Constitution. State v. Edwards, 375 So.2d 1365, 1366 (La.1979); State v. Scott, 355 So.2d 231 (La.1978). The apparent reason for this void in the record is the defendant's failure to raise this issue at the time of the original motion to suppress hearing. Under these circumstances, I think that the correct approach to resolution of this assignment is to remand the case for a reopened hearing giving both parties opportunity to address the serious question of the circumstances surrounding the defendant's arrest and his interrogation.
NOTES
[1] C.Cr.P. 703(C) (prior to 1978 and 1980 amendments):

"C. On the trial of a motion to suppress filed under the provisions of this article the burden of proof is on the defendant to prove the grounds of his motion, except that the state shall have the burden of proving that a purported written confession or written inculpatory statement was made freely and voluntarily and was not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises."
[2] "D. On the trial of a motion to suppress filed under the provisions of this Article, the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant." C.Cr.P. 703(D).
[3] The officer testified that he did not tell Serrato that his wife was dead because he did not want to "alarm" him.
[4] The record does not reveal whether defendant would have been restrained had he attempted to leave the police station prior to his formal arrest. It is not clear, therefore, whether defendant was actually arrested prior to his formal arrest within the meaning of C.Cr.P. 201, which provides as follows:

"Arrest is the taking of one person into custody by another. To constitute arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him."
[5] From a review of the entire record, one can glean from the police activity on October 10 that Serrato's car, which was left in New Iberia, was searched. However, the only known evidence retrieved from the car was a letter from Serrato to his girl friend. This document was introduced on cross-examination of Serrato to attempt to impeach his testimony that he loved his wife. The police also observed some scratches on Serrato's face on October 10. Serrato explained that he received the scratches while running with his daughter from the field where the helicopter landed on his return home from New Iberia.
[6] Cormier admitted at trial that his suggestion was motivated by the fact that the attorney could witness a written confession. He further testified that Serrato never asked him for an attorney.
[7] "The person arrested has, from the moment of his arrest, a right to procure and confer with counsel and to use a telephone or send a messenger for the purpose of communicating with his friends or with counsel." C.Cr.P. 230.
[8] "The accused in every instance has the right to defend himself and to have the assistance of counsel. His counsel shall have free access to him, in private, at reasonable hours." C.Cr.P. 511.
[9] Serrato withheld information from Dr. Hayes concerning "his continuous difficulty with remembrances of his war trauma, his experiences in Viet Nam, flash-backs and dreams, startled responses, his alienation from the majority of the society that he functioned in prior to the war, and a lot of other symptoms which obviously point to the so-called Vietnamese Syndrome and the post-traumatic stress disorder."
[10] "The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded. The court, on motion of the defendant, shall grant a new trial whenever:

. . . . .
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty." C.Cr.P. 851(3).
[11] Dr. Ritter, on the other hand, checked defendant's service record simply to determine that he was in Vietnam.
[12] "A defendant charged with a felony shall be present:

(1) At arraignment;
(2) When a plea of guilty, not guilty, or not guilty and not guilty by reason of insanity is made;
(3) At the calling, examination, challenging, impanelling, and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror;
(4) At all times during the trial when the court is determining and ruling on the admissibility of evidence;
(5) In trials by jury, at all proceedings when the jury is present, and in trials without a jury, at all times when evidence is being adduced; and
(6) At the rendition of the verdict or judgment, unless he voluntarily absents himself." C.Cr.P. 831.